**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

```
─────────────────────────────
                              )
UNITED STATES OF AMERICA,     )
                              )
                              )
     v.                       )        CRIMINAL ACTION
                              )        NO. 99-10218-WGY
ROBERT C. LUISI,              )
                              )
          Defendant.          )
─────────────────────────────)
```

MEMORANDUM

YOUNG, D.J.                                    July 25, 2008


     In September of 2002, a federal jury convicted Robert C.

Luisi on three counts of possession with intent to distribute and

distribution of cocaine in violation of 21 U.S.C. § 841(a)(1).

See Jury Verdict [Doc. No. 190].  In this first trial, Luisi, "an

admitted member of the La Cosa Nostra crime family," presented a

complex entrapment defense.  United States v. Luisi, 482 F.3d 43,

45 (1st Cir. 2007).  He averred that Ron Previte, a fellow La

Cosa Nostra member who was also a government informant, had

worked in concert with an FBI agent, Michael McGowan, to

"improperly induce him to commit drug crimes."  Id.  Luisi

maintained that when their initial inducements failed, the

informant and agent convinced Joe Merlino, Luisi's superior in La

Cosa Nostra, to order Luisi to commit the charged offenses.  Id.

Previte and McGowan, Luisi posited, knew that this was an order

he could not refuse.  Id.

The First Circuit vacated Luisi's conviction because the district court refused to give an entrapment instruction.  Id. On remand, the case was assigned to this session of the Court. On March 12, 2008, a second jury convicted Luisi on the same three drug-related counts.  Jury Verdict [Doc. No. 257]. Although Luisi's entrapment defense at times lent the proceedings the air of The Godfather, the trial was otherwise unremarkable.

Jury deliberations, however, presented the Court with two issues.  First, after only an hour of deliberations, the jury sent a note indicating that one juror refused to accept the legitimacy of the drug laws at issue.  After it became clear that deliberations could not move forward, the Court conducted individual juror voir dire.  The Court dismissed Juror No. 2[1] because he was unwilling to set aside his belief that the Commerce Clause does not give Congress the authority to proscribe mere possession of narcotics.  The second issue arose when Juror No. 3, a man in his mid-fifties, informed the Court of teenage drug use and a resulting arrest.  Juror No. 3's revelations, however, did not provide grounds for removal because any resulting legal consequences had completely resolved more than seven years before his service.

I.   **BACKGROUND**

---

[1] The Court has assigned juror numbers in order to preserve the juror's privacy for the purposes of this opinion.

Luisi's case went to the jury just before noon on March 11. At approximately 1:00, the Court received the following note:

> One juror is asking: Where – if two-thirds of both houses of congress voted in 1919 that it was necessary to amend the constitution to give congress the power to ban mere possession of a substance (prohibition of alcohol in that case) – is the constitutional grant of authority to ban mere possession of cocaine today?

Trial Tr. vol. 9, 2 (March 12, 2008).  The Court instructed the jury that they were not free "to determine any constitutional questions about [the] law."  <u>Id.</u> at 3.

At 3:00, the jury sent two more questions.  The first inquired, "If a juror denies on constitutional grounds the validity of the trial, charges, and jurisdiction thus preempting consideration of the facts in question, is he an ineligible juror?"  <u>Id.</u> at 7.  The second asked, "Are we, given these objections, a legally constituted jury?"  <u>Id.</u>

After speaking with counsel, the Court convened and again instructed the jurors that the laws at issue were constitutional and that they were not free to substitute their own views.  <u>Id.</u> The Court then told the jury they were to take the rest of the day off and to reflect on the Court's instructions.  <u>Id.</u> at 11-12.  The next day, after researching the issue and consulting the attorneys, the Court determined that if the problem persisted each juror should be brought into the lobby in the presence of counsel and the Court should inquire 1) whether he or she believed he or she could faithfully apply the law as instructed

to the facts of the case; and 2) whether he or she could begin their deliberations afresh if a juror had to be removed and replaced by an alternate.  <u>See</u> Trial Tr. vol. 10, 6 (March 13, 2008); <u>see</u> <u>also</u> <u>United States</u> v. <u>Kemp</u>, 500 F.3d 257, 302 (3d Cir. 2007) (recognizing that individual questioning of jurors may be "the optimal way to root out misconduct").

When the jury arrived, the Court instructed them to continue deliberations, but told them that they should send another note if the problem persisted.  <u>Id.</u> at 5.  Within ten minutes, the foreperson passed a note indicating that one juror still refused to engage in deliberations.  The Court instructed the jurors to suspend deliberations and began questioning each juror in the lobby.

The Court first spoke with the foreperson, who answered both of the aforementioned questions in the affirmative.  Juror No. 2 was the second juror questioned.  He immediately informed the Court that he was the juror who had asked the first juror question and who was the subject of the second and third questions.  <u>Id.</u> at 10.  He then explained:

> My question was where, if, . . . as every schoolboy knows, the highest law in the land is the United States Constitution, and if [C]ongress had to go to amend the [C]onstitution in, actually it was ratified in 1919, the 18th Amendment, in order to have the power to ban not interstate commerce but mere possession, where is [Congress' authority to ban mere possession of drugs] in the [C]onsitution[?]
> 
>        *           *           *
> 
> Congress is empowered by Article I, in a list of about 17

4

> specific empowerments, I'm unaware, and it was never made
> clear to me, where [banning mere possession of drugs] is
> authorized in the Constitution.

Id. at 12-13.

The Court then informed Juror No. 2 that the Supreme Court
had interpreted the Commerce Clause "to extend to enacting laws
with respect to contraband, including contraband drugs." Id. at
14. When asked if he could accept that interpretation and apply
the law passed by Congress to Luisi's case, Juror No. 2 stated
that he could "only accept the words that have been given to
[him], and [he could] only accept the fact that [the Commerce
Clause] is written as it is written." Id. Juror No. 2 also took
exception to the Court's reference to the Supreme Court
interpreting the Constitution. In his words, "[I]nterpret is a
word I associate with reading a foreign language. The
[C]onstitution as . . . you know, is written in English." Id.
at 16. He pontificated:

> As an educator, I know that [the Constitution is] written
> to the eleventh grade vocabulary level. And "among the
> several states" is a reference to, is basically the
> plural between. It's more than two. And I know that if
> a plane crashes between North America and Europe it did
> not crash in Denver. I know that there's a specific
> meaning to those words.

Id.

At one point during the exchange, the Court asked Juror No.
2 whether he believed he had the authority to "decide whether the
law is valid." Id. at 14. He responded:

No, I don't decide. . . .  I am familiar with the
philosophy known as a fully informed juror,[2] but I
disagree with it.  What I'm saying is that the interstate
commerce clause . . . those words have a specific
meaning; that words have meaning.

Id.

The Court spent several minutes attempting to explain how
Congress had the authority to ban drug possession but continued
to receive evasive responses.  The Court then asked Juror No. 2
to step out in the hallway in order to confer with counsel.  The
Court informed counsel of its opinion that Juror No. 2 was
"engaged in juror nullification and [the Court believed] it was
within [its] power to dismiss him."  But before dismissing Juror
No. 2, the Court wanted to hear argument.  The government did not
object to the dismissal.  Id. at 21.  Luisi's counsel objected on
the ground that Juror No. 2 had stated he did not agree with the
Fully Informed Juror, which "is essentially a study of juror
nullification."  Id.

Notwithstanding Juror No. 2's professed disagreement with
the "philosophy known as a fully informed juror," it was clear he
believed the Commerce Clause did not permit Congress to pass laws
related to drugs that did not cross "more than two" state lines
and that he did not accept the power of the judiciary to
interpret the Clause to embrace any additional power.  It was

_____

[2] As shall be explained, the Fully Informed Juror is a
website that advocates jury nullification.

6

equally clear that he was unable to set aside his personal
beliefs and apply the law as instructed.  Notwithstanding defense
counsel's argument, the Court was convinced that this was a form
of juror misconduct that could be classified as nullification.
See United States v. Thomas, 116 F.3d 606, 614 (2d Cir. 1997)
("'[N]ullification' can cover a number of distinct, though
related, phenomena, encompassing in one word conduct that takes
place for a variety of different reasons; jurors may nullify, for
example, because of . . . [a] general opposition to the
applicable criminal law or laws.").  At bottom, Juror No. 2's
insistence on applying his own law was grounds for dismissal.
The Court therefore dismissed Juror No. 2 and replaced him with
the first alternate, who up until that point had been isolated
from the deliberating jury.

     After questioning each of the remaining jurors, the Court
brought the newly constituted jury into the courtroom and
explained that they were to begin their deliberations afresh.
Trial Tr. vol. 10, 33.  Later that afternoon, the Court received
another note.  This time an individual juror wished to speak with
the Court out of the presence of the others.  Sealed Trial Tr. at
36.  The Court contacted the attorneys and brought the juror into
the lobby.  The juror, who was in his mid-fifties, stated that he
felt compelled to inform the Court that as a teenager he "had a
drug problem" and that this "experience when [he] was a kid . . .

7

35, or however many years ago, did result in an arrest with drugs." Id. at 38. He stated, however, that his "life as an adult . . . [has been] more responsible and measured." Id. The Court inquired if he believed he could remain impartial, and Juror No. 3 indicated that he could. Id. at 39. Because the indiscretions had occurred more than seven years ago, the Court instructed Juror No. 3 to return to deliberations.

## II. ANALYSIS

No other country has placed so much faith in the ability of ordinary citizens directly to participate in the function of the justice system. William G. Young, Vanishing Trials, Vanishing Juries, Vanishing Constitution, 40 SUFFOLK U. L. REV. 67, 68 (2006) ("Nearly all civil jury trials and ninety percent of criminal jury trials on the planet take place in the United States."). The men and women that fill jury boxes in courthouses across the country inject our judicial system with the conscience of their communities, provide a check against tyranny, and legitimize our justice system. See United States v. Green, 346 F. Supp. 2d 259, 316 (D. Mass. 2004). Along with trial court constitutional interpretation, the jury is "one of two defining features of our legal system." Young, Vanishing Trials, supra, at 68.

The jury in this case confirmed this Court's faith in the jury system. They were unswayed by Juror No. 2's attempts to convince them that they need not follow the law as instructed.

8

Yet, Juror No. 2's nullification effort strikes at the heart of the delicate division of labor between judge and jury that has been critical to their survival.  Before explaining the specific reasons for dismissing Juror No. 2, the Court chronicles the evolution of these roles and discusses how the jury, operating within its sphere, has been critical to the maintenance of an empowered, independent judiciary.  Nullification, as shall be explained, threatens to undermine the jury system, and with it the rule of law and judicial independence.

A.    NULLIFICATION THREATENS TO FURTHER THE DECLINE OF THE JURY SYSTEM AND ERODE JUDICIAL INDEPENDENCE

1.    **"The Constitutional Judges of Facts"**[3]

Judges and juries play familiar roles in modern courtrooms. Judges, assisted by lawyers, interpret the jargon and terms of art packed into the array of statutes and caselaw governing a given case.  Within the legal framework the judge outlines, juries apply their collective experience to the facts of a case to determine the truth.  Within its sphere, the jury is equal to any other constitutional officer.  Id. at 71.  Their power, however, has a critical limitation: they must follow the law as the judge instructs.  The discrete roles for judge and jury were not, however, settled until nearly two decades after the birth of the Republic as jurists embraced instrumentalism along with a

---

[3]  Brown v. Frost, 2 S.C.L. 126, 1798 WL 243, at *4 (S.C. Const. App. Dec. 30, 1798).

9

need for legal certainty that would enable private actors, particularly commercial interests, to order their affairs according to the rule of law.

Given the common law tradition inherited from England, there was never any serious question that the jury would play a central role in the American legal system.  See AKIL REED AMAR, AMERICA'S CONSTITUTION: A BIOGRAPHY 233 (2005).  Nevertheless, the power that ought be ascribed to juries was a matter of debate in the early Republic.  Some advocated that the jury should have the power "to follow the Constitution as they understood it." Id. at 239. Others recognized that "[w]ithout limits, a sweeping right of jury review might well have given eccentric localities too much power to frustrate – essentially to nullify – federal laws strongly supported by the national citizenry." Id. at 241.

One reason the jury's powers were still a matter of debate was that in the late eighteenth century the legal profession was in its nascent stage.  Because there were no law schools, judges and lawyers had little in the way of formal legal training that would enable them to interpret laws any more artfully than the ordinary citizens called to serve on a jury.  Id. at 240.  Thus, there appeared to be little justification for divesting juries of the ability to have their say about the law.  Id.  Perhaps more importantly, the undeveloped legal profession and the uncertainty about the function of juries reflected an ambivalence about the

10

role courts would play in shaping relationships between private
actors.

In the 1780s, instrumentalism had yet to emerge as the
dominant conception of American law.  See MORTON J HOROWITZ, THE
TRANSFORMATION OF AMERICAN LAW, 1780-1860 1-2 (1977).  That is, in
1787, judges and lawyers had yet to fully embrace a formal role
in establishing the rule of law, and they had yet come to terms
with the role that their rules would play in ordering society.
See id.  In the final decade of the eighteenth century, however,
"lawyers and judges can be found with some regularity to reason
about the social consequences of particular legal rules."  Id. at
2.

These developments in legal thought were prodded by the
rapid development of the American economy that transformed law
into a profitable, even lucrative profession.  Up until the
twilight of the eighteenth century, most cases involved disputes
over relatively small amounts of money.  Id.  By the late
eighteenth and early nineteenth centuries, however,
industrialization had brought about larger, more sophisticated
commercial enterprises, and these commercial interests looked to
courts to resolve disputes.  Id. at 140.  It soon became apparent
that law would have a significant role in fashioning rules for
the growing economy and that a lawyer's involvement in the
process could translate into significant legal fees.  Id.  For

11

example, Alexander Hamilton, who had left a fairly mundane law practice to become Secretary of the Treasury, returned to New York to find business booming.  Id. at 141.  "One of Hamilton's first cases terminated in an astronomical damage judgment of $120,000."  Id.

At the same time the legal profession began to embrace instrumentalism, and as commercial interests turned to the law to resolve disputes, courts came under fire for their failure to fashion clear rules that would "enable[] individuals to plan their affairs more rationally."  Id. at 26.  While judges shouldered a good deal of the blame for the lack of legal certainty, id. at 4-6, allowing juries to follow their own law led to ad hoc decisions and undermined uniformity and predictability.  Id. at 28.  Influential legal thinkers of the day recognized that establishing a predictable rule of law was critical to the growth of America's fledgling economy.  The future chief justice of Connecticut, Zephaniah Swift, observed the "relationship between 'uniformity of decision' in England and 'the immense wealth and commercial prosperity of that nation.'" Id. at 26.

The commercial interests, which in most cases were "not very fond of juries," id. at 141, along with lawyers and judges, saw that a greater degree of legal certainty could be achieved if judges assumed responsibility for determining the law in each

12

case.  Nevertheless, the use of juries, which was embedded in no fewer than three places in the Constitution, was not negotiable. Thus, lawyers and judges became the primary guardians of the law, and juries became, as the Constitutional Court of Appeals of South Carolina observed in 1798, "the constitutional judges of facts."  Brown, 1798 WL 243, at *4.[4]

The permanent change in the relationship between judges and juries came about in three ways.  First, looking to Lord Mansfield's example, American judges began accepting lawyer's motions to have certain matters determined as a "special case" or a "case reserved."  HORWITZ, supra, at 142.  In these procedures, parties asked judges to resolve issues of law without submission to the jury.  Id.  Second, judges began granting new trials for verdicts "contrary to the clear weight of the evidence."  Id. These procedural mechanisms curbed the juries' ability to generate outcomes that were contrary to the law the court had fashioned.

Third, and most importantly, "[d]uring the first decade of the nineteenth century . . . the Bar rapidly promoted the view that there existed a sharp distinction between law and fact and a correspondingly clear separation between judge and jury."  Id. at

---

[4] One notable exception to the trend is Indiana, which became a state in 1816 and preserved the jury's right to decide questions of the law in its state constitution.  NEIL VIDMAR AND VALERIE P. HANS, AMERICAN JURIES: THE VERDICT 228 (2007).

143.   The idea quickly gained traction, and state supreme courts

began requiring trial judges to instruct juries on the law.   Id.

In Massachusetts, for example,

> [b]y 1810, it was clear that the instructions of the
> court, originally advisory, had become mandatory and
> therefore juries no longer possessed the power to
> determine the law.   Courts and litigants quickly
> perceived the transformation that had occurred and soon
> began to articulate a new principle — that "point[s] of
> law . . . should . . . be . . . decided by the Court,"
> while points of fact ought to be decided by the jury.

Id. (quoting W. NELSON, AMERICANIZATION OF THE COMMON LAW: THE IMPACT OF

LEGAL CHANGE ON MASSACHUSETTS SOCIETY, 1760-1830 169 (1975)).

The division of labor between judge and jury that emerged in

the beginning of the nineteenth century applied in civil as well

as criminal cases.   As one lawyer explained before the New York

Supreme Court:

> The certainty of the criminal law is as important as
> that of the civil, and that can only be preserved by
> leaving it to be expounded by judges, to whom education
> and habit have rendered it familiar, and who join
> knowledge of its theory to the aptitude which practice
> gives.

People v. Melvin, Yates Sel. Cas. 112 (N.Y. Sup. Ct. 1810).

It was equally clear that juries could not apply their own

understanding of the Constitution.   In United States v.

Callender, 25 F. Cas. 239 (Circuit Court, D. Va. 1800), James

Thompson Callender was indicted for "maliciously designing and

intending to defame the president[, John Adams,]" in violation of

the Sedition Act, 1 Stat. 597.   In rejecting Callender's

14

counsel's plea to put the question of the statute's

constitutionality to the jury, Justice Samuel Chase, an associate

justice of the Supreme Court of the United States who was riding

circuit, stated unequivocally:

> I cannot conceive that a right is given to the petit jury
> to determine whether the statute . . . is constitutional
> or not.  To determine the validity of the statute, the
> constitution of the United States must necessarily be
> resorted to and considered, and its provisions inquired
> into.  It must be determined whether the statute alleged
> to be void, because contrary to the constitution, is
> prohibited by it expressly, or by necessary implication.
> Was it ever intended, by the framers of the constitution,
> or by the people of America, that it should ever be
> submitted to the examination of a jury, to decide what
> restrictions are expressly or impliedly imposed by it on
> the national legislature?

Callender, 25 F. Cas. at 255 (Chase, J.).[5]  The Chief Justice of

---

[5] The Callender trial took place in the sultry political
climate created by the passage of the Alien and Sedition Acts
during John Adams's lone term as president. WILLIAM H. RENHQUIST,
GRAND INQUESTS: THE HISTORIC IMPEACHMENTS OF JUSTICE SAMUEL CHASE AND
PRESIDENT ANDREW JOHNSON 47-48 (1992).  Callender, described by one
historian as a "reptillian adornment[] of contemporary
journalism," had been indicted for publishing The Prospect Before
Us, a scathing critique of the Adams administration and Adams
personally.  Id. at 75.  He was tried and convicted in a
proceeding in Richmond, Virginia, but was pardoned by President
Jefferson, a Republican and political ally.  Id.  Justice Chase,
a staunch Federalist, was impeached for his conduct during the
Callender trial as well two other proceedings.  Id. at 20-21.
    Chase's quick temper and overbearing personality had
allegedly gotten the best of him during the Callender trial.  See
id. 85-87.  Officially, the grounds for impeachment relating to
the Callender case were as follows: 1) he ordered a juror to be
seated who should have been excluded; 2) he refused to admit in
evidence the testimony of one of Callender's witnesses; 3) he
required Callender's counsel to put certain questions in writing
for the court before he was allowed to ask them; and 4) he
"repeatedly interrupted and harassed defense counsel in their
presentation of their case."  Id. at 77.  Unofficially, the

the United States may as well have been answering the Callender

court's rhetorical question when he declared, "It is emphatically

the province and duty of the judicial department to say what the

law is." <u>Marbury</u> v. <u>Madison</u>, 1 Cranch 137, 177 (1803).  At no

time since <u>Marbury</u> has the fundamental principle in Justice

Chase's declaration been seriously questioned.

### 2.    The Twin Fates of the Jury and Judicial Independence

essence of the charge seems to have been that Chase commandeered
a judicial proceeding to railroad a political opponent.  <u>See</u> <u>id.</u>
at 86.  Of course, if using an official proceeding to achieve
political ends was the crime, then the Republicans were probably
guilty of hypocrisy.  <u>Id.</u> at 88-89.  Even John Quincy Adams seems
to have believed that Chase's impeachment was not only a personal
attack on Chase, but an attempt to send a message to the rest of
the judiciary, which was led by Federalist John Marshall.  <u>Id.</u> at
107.  Whatever the reason for the charges, Chase was acquitted.
<u>Id.</u> at 105.  More importantly, the propriety of Chase's refusal
to permit the jury to consider the constitutionality of the
Sedition Act was not seriously questioned.  <u>See</u> <u>id.</u> at 85-86.
    It is also interesting to note that presiding over Chase's
impeachment was then vice-president Aaron Burr's last significant
act as a public official.  <u>Id.</u> at 20.  Burr, who had killed
Alexander Hamilton in a duel seven months prior to the
proceeding, was under indictment for Hamilton's murder and would
soon vanish into the American wilderness, a fugitive.  <u>Id.</u> at 19-
20.  He would reemerge two years later in the custody of United
States Marshals.  <u>Id.</u>  The ground for Burr's arrest was an
alleged treasonous plot to incite war with Spain, which entailed
a bizarre scheme whereby Burr purportedly sought to raise an army
and "seize portions of American soil, including Louisiana and
other territories west of the Appalachians, in order to forge a
new empire."  RON CHERNOW, ALEXANDER HAMILTON 720 (2004); <u>see also</u>
JOSEPH J. ELLIS, FOUNDING BROTHERS: THE REVOLUTIONARY GENERATION 38-39
(2000).  If all went as planned, Burr, the would-be ruler of the
new empire, would "march into Mexico and liberate it from Spanish
rule."  CHERNOW, supra, at 720.  Burr was tried and "acquitted by
Chief Justice John Marshall, who applied a strict definition of
treason."  <u>Id.</u>

16

By infusing a greater degree of predictability and
uniformity into the law, the division of labor between judge and
jury that emerged at the beginning of the eighteenth century
insured that the courts would remain instrumental in shaping the
rules that govern society.  As of the early 1800's, the role that
"inferior" courts of the United States would play in the legal
system was not yet ascertainable.  With lower courts mentioned
but not mandated in Article III, it was not clear how many courts
Congress would create.  Moreover, while Marbury established the
primacy of the Supreme Court, it said nothing of lower courts.
Ultimately, it was the jury trial that empowered and legitimized
the role of the federal district courts in constitutional
interpretation, thereby establishing judicial independence
throughout the entire Article III judiciary.  Today, however, the
jury and jury trials are imperiled, and so too is the independent
judiciary.

 3. **Juries have established district courts' authority
    to "say what the law is"**

That the judiciary's relevance in the scheme of government
is tied to the jury trial is apparent from our constitutional
design.  Juries not only account for the existence of district
courts, but they also have established their authority to "say
what the law is."  Marbury, 1 Cranch at 177.  Without the power
to declare a statute unconstitutional, the judiciary never could
have become a vibrant countermajoritarian force with the ability

17

to check the popularly elected branches -- a nationwide system
that makes binding constitutional adjudication as close as the
nearest federal courthouse.

Without the jury trial rights guaranteed in Article III as
well as the Sixth and Seventh Amendments, Congress would not have
had to create lower federal courts.  Article III only mandates
the creation of a Supreme Court, and Congress may "ordain and
establish" "inferior courts."  U.S. Const. art. III § 1.  Yet,
Article III also provides that "[t]he trial of all crimes . . .
shall be by jury; and the trial shall be held in the state where
said crimes shall have been committed."  U.S. Const. Art. III,
sec. 2.  The Sixth Amendment echoes the jury requirement for
criminal trials, and the Seventh Amendment gives citizens the
right to a jury trial in civil cases tried to juries "at common
law."  U.S. Const. amend. VII.   These provisions require
Congress to create Article III courts that will offer meaningful
access to jury trials.  In short, the raison d'etre for district
courts "is to afford jury trials to our people pursuant to the
United States Constitution."  Young, Vanishing Trials, supra, at
80.

The requirement that ordinary citizens – as opposed to
elected representatives – take responsibility for the
administration of justice is our Constitution's most shining
example of direct democracy.  It is no coincidence that the

18

framers employed unbridled democracy in Article III. As
Professor Amar has explained, the jury requirement provides a
check against life-tenured judges and prosecutors that is no less
significant than the Senate's check on the House of
Representatives. See AMAR, supra, at 236 ("[A] criminal judge
sitting without a criminal jury was simply not a duly constituted
federal court capable of trying cases, just as the Senate sitting
without the House was not a duly constituted federal legislature
capable of enacting statutes."); see also Akhil Reed Amar, The
Bill of Rights as a Constitution, 100 YALE L.J. 1131, 1196
(1991).

Even the district court's authority to declare a law
unconstitutional is attributable to juries. In fact, a district
court first claimed that authority on the eve of a jury trial.
In 1808, the United States sought the forfeiture of The William,
a Boston brigantine accused of violating Jefferson's Embargo Act.
Hon. William G. Young, Of Iron Men and Wooden Ships Who Went to
Sea With Sails: Famous Admiralty Cases in the Federal District
Court in Massachusetts, in LEGAL CHOWDER: LAWYERING AND JUDGING IN
MASSACHUSETTS 186 (Hon. Rudolph Kass, ed. 2002) (hereinafter, "Of
Iron Men"). The owners of The William denied wrongdoing. As the
case progressed toward trial, Judge John Davis, a federal
district court judge in Massachusetts, faced a dilemma. On one
hand, the Act was seen as crippling local commerce, and Bay

19

Staters clamored to have the it declared unconstitutional.  <u>Id.</u>
On the other, the Embargo Act was a clear expression of the
administration's policies and had sailed through a heavily
Jeffersonian Congress.  <u>Id.</u> at 187.  Judge Davis, an Adams-
appointed federalist who was undoubtedly familiar with the
impeachment of Justice Chase, <u>see</u> footnote 5, supra, was aware
that the administration might not look kindly upon an adverse
ruling.  <u>Id.</u> at 186-87.[6]

It was not clear, however, that a federal district judge had
the authority to pass judgment on a law of Congress.  <u>Id.</u> at 186-
87.  On the eve of trial, Judge Davis determined in dicta that a
district court could declare a law unconstitutional. <u>See</u> <u>United
States</u> v. <u>The William</u>, 28 F. Cas. 614, 620 (D. Mass 1808) (Davis,
J.).  Nevertheless, he concluded that Congress had not exceeded
its authority in passing the Embargo Act.  <u>Id.</u> at 623.  Days
later, a jury acquitted <u>The William</u>'s owners.  <u>See</u> Young, Of Iron
Men, supra, at 187.

<u>The William</u> illustrates the way in which a district court's
authority to "say what the law is" depends upon juries.  If <u>The
William</u>'s owners had not sought a jury trial, it is unlikely that
Davis would have reached the critical constitutional issue.  The

---

[6] It is interesting to note that the United States sent
future Supreme Court Justice Joseph Story, who had already gained
a reputation as one of the great legal minds of the time, to
argue on its behalf. Young, Of Iron Men, supra, at 186.

reason Davis could not sidestep the question of his authority was
that he had to be able to explain the law to the jury.  But
perhaps more importantly, the fact that the jury was assigned the
task of determining guilt or innocence as a factual matter meant
that Davis's legal conclusion was not dispositive.  Thus, the
jury diminished the risk that the sultry political climate would
taint the court's ruling.

Davis's decision highlights the way the jury's fact-finding
role has legitimized the judiciary's declarations of law.  Not
only have juries imposed a layer of isolation from political
pressure, but they also have helped to democratize the legal
process.  Without the jury's democratic check, "the pursuit of
justice becomes increasingly archaic, with elite professionals
talking to others, equally elite, in jargon the eloquence of
which is in direct proportion to its unreality."  Green, 346 F.
Supp. 2d at 316.  Pronouncements emanating from such a process
would command and deserve little respect.  In sum, "[o]nly
because juries decide most cases may we tolerate the reality that
judges decide some.  However highly we view the integrity and
quality of our judges, . . .  the involvement of ordinary
citizens in a majority of the court's tasks provides legitimacy
to all court actions."  William G. Young, Vanishing Trials,
supra, at 72.

However obvious it may seem today, a district court's

authority to interpret the Constitution has far-reaching
implications.  Because of the principle established in The
William, citizens across the country can walk into a federal
district court, claim their right to a jury trial, regardless of
whether they claim a right to recovery on some clearly
established legal theory.  Over time, citizens have turned to the
district courts to challenge various laws and claim the promise
of the Reconstruction Amendments.  In the process, they have
established the courts -- all the federal courts -- as an
authoritative check against the popularly elected branches.  As
shall be shown below, if judicial independence is coterminous
with a court's ability to "say what the law is," Marbury, 1
Cranch at 177, subject only to a reviewing court, then judges
marginalize the jury at their own peril.

4.   **The decline of jury trials should sound a clarion
     call for those concerned about judicial
     independence**

Juries are essential to judicial independence.  Without
juries, courts would have little occasion or authority to
interpret the Constitution.  Without juries, judges become
glorified hearing officers whose contributions to society could
not possibly justify grand courthouses, courtrooms, or judicial
staff.  Without juries, life-tenured judges could be replaced by
an Article I tribunal whose terms are dependent upon the
executive.  Without juries, our justice system would be no better

22

than the civil law system that dominates so many countries.
Without juries, true separation of powers collapses and the
administration of justice is left to the popularly elected
branches.  It follows that the fate of the American jury and the
independent judiciary are inextricably intertwined.

Despite their centrality to our justice system, jury trials
are imperiled.  See Honorable Sam Sparks & George Butts,
Disappearing Juries and Jury Verdicts, 39 TEX. TECH L. REV. 289,
295 (2007).  Although federal court civil filings increased 152%
between 1970 and 1999, the percentage of cases that went to trial
decreased from 12% to 1.8% from 1970 to 2002.  Id.  During
roughly that same period, the total number of cases disposed of
annually in federal courts increased from 50,320 in 1962 to
258,876 in 2002.  Id.  Yet, in 2002, there were only 3,006 jury
trials compared to 2,765 jury trials in 1962.  Id.  The rough
sketch offered by this empirical data only confirms what
experienced lawyers and trial judges already knew: jury trials,
particularly civil jury trials, are rapidly declining.

Business and insurance interests, which have long disparaged
civil juries, have pressed Congress to pass legislation severely
limiting the jury's domain.  Young, Vanishing Trials, supra, at
76.  Much of the blame for the decline of the jury trial,
however, lies within the legal profession.  With so few civil
trials, trial practice is becoming a lost art and trial

23

practitioners an endangered species.  <u>Ciulla</u> v. <u>Rigny</u>, 89 F.
Supp. 2d 97, 102-04 n.7 (D. Mass. 2000).  In many firms here in
Boston and across the country, jury trials are undoubtedly spoken
of in the same breath as the Brooklyn Dodgers, the Jazz Age, or
"Miss American Pie."  Juries are mysterious creatures that are to
be instinctively feared.  Attorneys laboring under this mistaken
impression advise their clients to avoid them at all costs.  With
remittitur, additure, and a host of appellate rights, parties
have no more reason to fear a runaway jury than they would a
shark in an aquarium.  And yet the aversion seems to pervade the
legal culture.

Perhaps this largely unfounded fear is a manifestation of
the lawyer's insecurities about his effectiveness as a trial
advocate.  This Court does all within its power to settle civil
cases because litigation is expensive and such a resolution is
often favorable to both parties, but the Court cannot help but
wonder how many cases never reach trial because the lawyers do
not feel comfortable presenting their case to twelve of their
fellow citizens.  The Court also cannot help but wonder whether
the discomfort and unfamiliarity with jury trials has spread from
the bar to the bench.

Judges have failed to defend the institution upon which
their very existence and moral authority depends.  Young,
Vanishing Trials, supra, at 73.  Changes in jurisprudence and

judicial culture have dramatically curtailed the role of the jury in our justice system.  In the criminal context, the United States Sentencing Guidelines (now advisory) have marginalized the jury trial by creating a sentencing system that penalizes those who exercise their Sixth Amendment rights.  See id. at 74.  The Constitution requires that "[i]f the law identifies a fact that warrants deprivation of a defendant's liberty or an increase in that deprivation, such fact must be proven to a jury beyond a reasonable doubt."  United States v. Kandirakis, 441 F. Supp. 2d 282, 303 (D. Mass. 2006).  The vestiges of the mandatory guidelines have persisted in diminishing this fundamental requirement, thereby minimizing the significance of the jury's verdict and compromising the legitimacy of criminal sentences.  See id. at 304 (noting that "the importance of grasping these fundamental concepts has never been greater - nor their recognition less secure").

In the civil context, focus on trials has been replaced by a "settlement culture" that sees a jury trial as a failure of the justice system.  Young, Vanishing Trials, supra, at 80-81.  Spurred by the Supreme Court, courts have created a dubiously robust "federal policy favoring arbitration" that has funneled jury-trial-worthy cases into private dispute resolution.  Id. at 77-78.  In addition, courts have applied pre-emption jurisprudence so broadly that they have replaced state jury trial

rights with inferior federal remedies.  See, e.g., Cromwell v.
Equicor-Equitable HCA Corp., 944 F.2d 1272 (6th Cir. 1991)
(Jones, J., dissenting) (observing "that the courts have become
consumed in a fervor of preemption" that often bars legitimate
state law claims); Andrews-Clarke v. Travelers Ins. Co., 984 F.
Supp. 49, 65 (D. Mass. 1997) (noting that the broad pre-emption
doctrine applied in ERISA cases has granted employers "a shield
of immunity which thwarts the legitimate claims of the people it
was designed to protect").  Judge William Wilson has noted what
may be at the core of the overzealous preemption jurisprudence.
In his words, "the language in the decisions favoring preemption
is high flown; but at bottom, it reflects distrust of the
randomly selected citizens who sit on juries."  In re Prempro
Products Liability Litigation, No. 04-01169 [Doc. No. 648] at 2
(E.D. Ark. April 16, 2008) (Supplement to April 10, 2008 Order).

     Finally, statistics suggest that district courts and
appellate courts fail to afford jury verdicts the proper degree
of deference and that many trial courts simply overuse summary
judgment.  See Young, Vanishing Trials, supra, at 78-79;  Sparks
& Butts, Disappearing Juries and Jury Verdicts, supra, at 297-312
(discussing overturned jury verdicts in the Fifth Circuit and the
Texas Supreme Court); see also Marc Galanter, The Hundred-Year
Decline of Trials and the Thirty Years War, 57 STAN. L. REV. 1255,
1263, 1271-72 (April 2005); see generally Arthur Miller, The

Pretrial Rush to Judgment: Are the "Litigation Explosion,"
"Liability Crisis," and Efficiency Cliche's Eroding Our Day in
Court and Jury Trial Commitments?, 78 N.Y.U. L. REV 982 (2003).

Inasmuch as critics of jury trials complain that juries will
not reach the correct outcome, they are plainly mistaken. Twelve
citizens drawn from all walks of life are simply more likely to
discover the truth than a single fact-finder. See In re United
States Fin. Sec. Litig., 609 F.2d 411, 431 (9th Cir. 1979) ("[N]o
one has yet demonstrated how one judge can be a superior fact-
finder to the knowledge and experience that citizen-jurors bring
to bear on a case. We do not accept the premise . . . 'that a
single judge is brighter than the jurors collectively functioning
together.'") (quoted in Sparks, Disappearing Juries and Jury
Verdicts, supra, at 296). While a judge's years on the bench may
serve her well for resolving legal issues, juries bring to bear
the values, common sense, and a fresh perspective that only come
from life experience outside the courtroom. See Taylor v.
Louisiana, 419 U.S. 522, 530 (1975) ("The purpose of a jury is .
. . to make available the commonsense judgment of the community
as a hedge against the overzealous or mistaken prosecutor and in
preference to the professional or perhaps overconditioned or
biased response of a judge.")(quoted in Lanigan v. Maloney, 853
F.2d 40, 50 (1st Cir. 1988).

As Judge Royal Ferguson has observed:

27

> The best way yet devised to determine the facts and
> therefore the truth is in a trial before a jury. . . .
> This proposition holds regardless of whether the case is
> civil or criminal or straightforward or complex.  Juries
> come as close to perfection in the conduct of human
> affairs as any enterprise presently in existence.

Royal Ferguson, Prepared Remarks for The State Bar of Texas
Advanced Personal Injury Law Course:  We Do Justice In America
With Juries – Or Do We? (August 2008).  The decline of the jury
trial poses risks to the judiciary, in part, because the
legitimacy of the justice system is coterminous with its ability
to discover the truth.

If the jury continues to be marginalized, judicial
independence will suffer a similar fate.  Anyone who doubts that
Congress would ever undermine judicial independence need look no
further than the Antiterrorism and Effective Death Penalty Act of
1996 ("AEDPA"), 28 U.S.C. § 2254(d)(1), which permits federal
courts to look only to clearly established Supreme Court
jurisprudence in considering habeas corpus petitions from state
prisoners.  Judge Noonan of the Ninth Circuit has noted that the
limitations placed on reviewing federal judges are nothing short
of "the legislature [] tell[ing] a court how a case should be
decided."  Irons v. Carey,  505 F.3d 846, 855 (9th Cir. 2007)
(Noonan, J., concurring).  As Judge Lipez recently noted in a
powerful dissent to the denial of rehearing en banc in Evans v.
Thompson, 524 F.3d 1 (1st Cir. 2008), AEDPA's "congressional
intrusion on the process of constitutional adjudication in the

28

federal courts could not be more stark," id. at 4.  Another
example is the Real ID Act, 8 U.S.C. § 1252(a)(2)(C), which
blatantly strips courts of jurisdiction in an effort to avoid
outcomes adverse to the government might not like.  Enwonwu v.
Chertoff, 376 F. Supp. 2d 42, 79 (D. Mass. 2005) vacated on other
grounds by Enonwu v. Gonzales, 438 F.3d 22 (1st Cir. 2006).

As we judges torture the Rules of Civil Procedure to prune
trial-worthy cases from our dockets, as we are complicit in
jurisdiction stripping, as we nurture an overbearing culture of
settlement and policies favoring arbitration, as we fail to push
back against the marginalization of juries in sentencing, we
preside over nothing but our own expiration.  And as we vanish
along with the jury, we will take with us the judicial
independence and the separation of powers that were once the
bedrock of our democratic government.  As for this Court, I
decline to preside over the decline of this nation's most vital
expression of direct democracy, the American jury.[7]

### 5.   Nullification threatens further to undermine the jury system and to contribute to the collapse of the separation of powers

Despite the clearly defined roles for judges and juries,
there are those who believe that jurors possess an "unalienable

---

[7] My apologies to Faulkner, who so eloquently "decline[d] to
accept the end of man."  William Faulkner, Nobel Prize Acceptance
Speech at the Nobel Banquet at the City Hall in Stockholm, Sweden
(December 10, 1950).

right" to set aside the court's instructions and to apply the law as they see fit.  See History of the Fully Informed Jury Association, About FIJA - The History of FIJA, available at http://www.fija.org/index.php?page=staticpage&id=1 (last visited June 2, 2008).  In a recent Time Magazine article, writers for The Wire, a popular fictional television show about cops and criminals in Baltimore, advocated nullification as a way to bring an end to "the drug war," a term that refers to the enforcement of drug laws in low-income communities.  See Ed Burns, et al., "The Wire's War on the Drug War," TIME (March 5, 2008), available at http://www.time.com/time/nation/article/ 0,8599,1719872,00.html.  This call for nullification was by no means a cry in the wilderness.  Paul Butler, a professor at The George Washington University Law School, published an famous article in the Yale Law Journal advocating jury nullification in drug cases with black defendants.  See Paul Butler, Racially Based Jury Nullification: Black Power in the Criminal Justice System, 105 YALE L.J. 677, 680 (1995).  Websites such as the "Fully Informed Juror," which Juror No. 2 referenced during voir dire, advocate jury nullification for a variety of reasons.  See Fully Informed Jury Association, available at http://www.fija.org/ (last visited June 3, 2008); see also Clay Conrad, Medical Marijuana: Is Jury Nullification the Next Step? COUNTERPUNCH (June 17, 2005), available at

http://www.counterpunch.org/conrad06172005.html.

Over the course of thirty years on the bench, this is the first time that the Court has encountered a juror who has attempted to arrogate to himself the power that our Constitution places in the elected branches of government.  Thankfully, the citizens who occupy jury boxes across the country do not share such views.  Nullification has no basis in law, but if citizens felt free to nullify, it would undermine not only the rule of law, but also the values at the core of our democracy.  Moreover, nullification would fan the flames of anti-jury sentiment and contribute to the demise of the jury trial along with the independent judiciary.

> **i.    Juries Do Not Have a Right to Disregard the Judge's Instructions on the Law**

Courts have long recognized that defendants have no right to an instruction on jury nullification.  See United States v. Boardman, 419 F.2d 110, 116 (1st Cir. 1969).  A court may "block defense attorneys' attempts to serenade a jury with the siren song of nullification . . . and . . . may instruct the jury on the dimensions of their duty to the exclusion of jury nullification."  United States v. Sepulveda, 15 F.3d 1161, 1190 (1st Cir. 1993).

Just as defendants have no right to an instruction on nullification, jurors have no right to nullify.  As a D.C. Circuit panel comprised of Chief Judge Spottswood W. Robinson,

III, Judge George E. MacKinnon, and then-Judge Ruth Bader

Ginsburg explained:

> A jury has no more "right" to find a "guilty" defendant
> "not guilty" than it has to find a "not guilty" defendant
> "guilty," and the fact that the former cannot be
> corrected by a court, while the latter can be, does not
> create a right out of the power to misapply the law. Such
> verdicts are lawless, a denial of due process and
> constitute an exercise of erroneously seized power.

United States v. Washington, 705 F.2d 489, 494 (D.C. Cir.1983) (per

curiam) (emphasis in original).

### ii.   If Taken Seriously, Jury Nullification Threatens to Undermine the Democratic Process and the Rule of Law

If it were taken seriously by mainstream Americans, jury

nullification would threaten to unravel the fabric of our

democracy.  The impropriety of nullification emanates from the

notion that ours is "a government of laws and not of men."  See

Mass. Const. Part I, art. XXX.[8]  This means simply that no

citizen is above the law, and none is free to make his own law.

As Thomas Paine stated in Common Sense, "For as in absolute

governments the king is law, so in free countries the law ought

---

[8] This quote appears in numerous Supreme Court opinions, often without citation.  See, e.g., Zuni Public Schools Dist. No. 89 v. Department of Educ., ___ U.S. ___ , 127 S.Ct. 1534, 1557 (2007) (Scalia, J., concurring); Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 321 (1999); Patterson v. Shumate, 504 U.S. 753, 766 (1992) (Scalia, J., concurring).  Nevertheless, the Court has cited to the Massachusetts Constitution because the quote is generally attributed to John Adams, the author of the Massachusetts Constitution.

to be king; and there ought to be no other."  Thomas Paine,
Common Sense (1776), available at
http://www.mtholyoke.edu/acad/intrel/paine.htm.

It is a testament to the liberties afforded our citizens
that Juror No. 2 is free to express his beliefs about the meaning
of the Constitution.  He is not, however, free to implement his
views at his pleasure.  Those who would change the law must work
through democratic channels.  Juror No. 2 and others who feel
Congress does not have the authority to ban possession of
narcotics may attempt to win the hearts and minds of the American
people.  Should the people tire of drug laws, they may elect
representatives who will repeal them; they may elect a president
who will not enforce them; they may amend the Constitution to
abolish them.  They may work to change the law, but they are not
free to disregard it.

The notion that nullification will change the law is drivel.
Those who would characterize it as a noble form of civil
disobedience are deeply delusional.  Under the theory of civil
disobedience followed by Gandhi and Dr. Martin Luther King, Jr.,
it is only appropriate to disobey the law if one does so
publicly, in an effort to change the law, and then accepts the
punishment.  As Dr. King explained in his Letter from Birmingham
Jail, "In no sense do I advocate evading or defying the law . . .
.  That would lead to anarchy.  One who breaks an unjust law must

33

do so openly, lovingly, and with a willingness to accept the penalty."  An Open Letter from Dr. Martin Luther King, Jr. to Alabama Clergymen (April 16, 1963), available at http://www.stanford.edu/group/King/popular_requests/frequentdocs/birmingham.pdf (last visited June 18, 2008).  Nullifiers do not openly disobey the law in order to change it. They conspire behind closed doors and cast the law aside at their caprice. This is not civil disobedience; it is anarchy.  One who engages in such a practice cannot hope to change the law, but only displace laws altogether.

History has not vindicated nullification.  To be sure, there have been isolated instances of "benevolent" nullification that "some may regard as tolerable." United States v. Thomas, 116 F.3d 606, 614 (2d Cir. 1997).  Proponents of nullification often cite the acquittal of William Penn in 1670, "John Peter Zenger, the publisher of the New York Weekly Journal [who was] acquitted of criminal libel in 1735, and the nineteenth-century acquittals in prosecutions under the fugitive slave laws." Id. at 614.  But these examples, culled from bygone centuries, are exceptions to an otherwise abhorrent strain of lawlessness.

By and large, when juries have felt free to apply their own law the result was what Professor Randall Kennedy has described as a "sabotage of justice." Id. at 616.  "Consider, for example, the two hung juries in the 1964 trials of Byron De La Beckwith in

34

Mississippi for the murder of NAACP field secretary Medgar Evers, or the 1955 acquittal of J.W. Millam and Roy Bryant for the murder of fourteen-year-old Emmett Till." Id.  History is replete with such "shameful examples of how nullification has been used to sanction murder and lynching." Id.[9]

> ### iii. By contributing to anti-jury sentiment, nullification poses a threat to the jury system and judicial independence

Nullification frustrates the sole purpose of the jury.  As this Court has instructed juries for some thirty years now, the word verdict comes from two Latin words meaning roughly "to speak the truth." Black's Law Dictionary 1593 (8th ed. 2004) (defining a verdict as "a declaration of the truth of the matter . . ."). Nullifiers, however, would render verdicts without regard to the

---

[9] Far from achieving the desired change in law, nullification may even create a political backlash that will undermine the nullifier's efforts.  In Race, Crime, and the Law, Professor Randall Kennedy highlights two instances where the threat of nullification led policymakers to intervene.  First, in the wake of the Civil War, when Southern whites indicated they would nullify the prosecutions of redeemers who resorted to violence to resist Reconstruction, "the ascendant political party in the national government responded with an unprecedented intervention of federal power in support of actions — the elevation of blacks to formal equality with whites — that the nullifiers abhorred." RANDALL KENNEDY, RACE, CRIME, AND THE LAW 301 (1997); but see NICHOLAS LEMANN, REDEMPTION: THE LAST BATTLE OF THE CIVIL WAR (2006) (describing the federal government's failure to intervene on behalf of African Americans when southern "redeemers" resorted to violence to intimidate Republican voters in Louisiana and Mississippi). In the other instance, "large and powerful blocks of society again intervened in unprecedented ways" to prevent Southern "segregationist diehards" from nullifying criminal prosecutions of white criminals who attempted to use violence to impede the Civil Rights Movement.  KENNEDY, supra, at 301.

truth.  Once juries begin to deviate from this core function, our
justice system has no more legitimacy than a Kangaroo court.  If
juries were to persist in making their own law, they would
confirm the stereotype that the business interests and skeptics
within the profession promulgate.  There are undoubtedly well-
intentioned would-be nullifiers who believe that they are aiding
the cause of justice.  In fact, they are undermining the jury's
core function.  By adding fuel to the flames of anti-jury
sentiment, nullification threatens to erode the jury system and
along with it the rule of law and the independent judiciary.

    With these principles in mind, the Court turns to the case
at bar.

   **B.    JUROR NO. 2'S REFUSAL TO FOLLOW THE LAW AS INSTRUCTED GAVE THE
          COURT "GOOD CAUSE" TO REMOVE HIM FROM THE JURY AND REPLACE HIM
          WITH THE FIRST ALTERNATE**

    Federal Rule of Criminal Procedure 23(b) provides that a
deliberating juror may be removed for "good cause," a broad term
that has justified the dismissal of jurors for physical ailments
as well as "bias, failure to deliberate, failure to follow the
district court's instructions, or jury nullification."  United
States v. Kemp, 500 F.3d 257, 304 (3d Cir. 2007).  A juror who
refuses to apply the law as instructed by the court "violates the
sworn jury oath and prevents the jury from fulfilling its
constitutional role."  United States v. Boone, 458 F.3d 321, 329
(3d Cir. 2006).  "[A] presiding judge possesses both the

responsibility and the authority to dismiss a juror whose refusal or unwillingness to follow the applicable law becomes known to the judge . . . ." <u>Thomas</u>, 116 F.3d at 617.  "[I]f [, however,] the record evidence discloses a reasonable possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror."[10] <u>Kemp</u>, 500 F.3d at 303.

Once a jury alerts the district court that one of their number refuses to engage in meaningful deliberations, the court should make an on-the-record inquiry to discover the reason for the refusal.  <u>See id.</u> at 302.  When a court determines that

---

[10] The rationale underlying this limitation is plain.  The Sixth Amendment embraces a defendant's right to retain his liberty unless a jury of his peers finds him guilty beyond a reasonable doubt.  <u>See</u> <u>United States</u> v. <u>Booker</u>, 543 U.S. 220, 238 ("The Framers would not have thought it too much to demand that, before depriving a man . . . of his liberty, the State should suffer the modest inconvenience of submitting its accusation to the unanimous suffrage of twelve of his equals and neighbours . . . .") (quoting <u>Blakely</u> v. <u>Washington</u>, 542 U.S. 296, 313-314 (2004)).  As Blackstone explained:

> Our law has therefore wisely placed this strong and two-fold barrier, of a presentment and a trial by jury, between the liberties of the people and the prerogative of the crown. . . .  [T]he truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbours, indifferently chosen and superior to all suspicion.

<u>Duncan</u> v. <u>Louisiana</u>, 391 U.S. 145, 151-52 (1968) (quoting 4 W. Blackstone, Commentaries on the Laws of England 349 (Cooley ed. 1899)).  The court would violate this right if it dismissed a juror who refused to convict because he believed that the government had failed to meet its burden of proof.

individual voir dire is necessary, it must proceed with caution, bearing in mind that "the secrecy of deliberations is the cornerstone of the modern Anglo-American jury system."  Id. at 618.

Here, the Court sought to avoid disrupting juror deliberations with individual juror voir dire.  Rather than initiating questioning after receiving the first three notes, the Court instructed the jurors to take the rest of the day off in hopes that the rogue juror would, after some reflection, follow the law as instructed by the court.  See Trial Tr. vol. 9, 5. But after the jury had returned to their deliberations for only a few minutes before alerting the Court that the problem had persisted, it became clear that individual voir dire could not be avoided.  See Trial Tr. vol. 10, 6-7.

 The Court asked two questions designed to insure that the remaining jurors could follow the Court's instructions, including the instruction that they must begin deliberations anew in the event the jury was reconstituted.  All the jurors, save Juror No. 2, answered both questions in the affirmative.  In questioning each juror, the Court took every precaution to preserve the secrecy of deliberations.

Upon examination, it was clear that Juror No. 2's unwillingness to engage in an application of the law to fact had no basis in any belief about Luisi's guilt or innocence.  Rather,

he believed that Congress had no authority to pass such a law and
that the government had no authority initiate such a prosecution,
and he was unwilling to set this belief aside in order to assess
the merits of the case.  The Court therefore excused Juror No. 2
pursuant to Federal Rule of Criminal Procedure 23(b).

### 1.    Replacing Juror No. 2 with the first alternate did not prejudice Luisi

Once the Court determined that Juror No. 2 had to be
excused, Federal Rule of Criminal Procedure 24(C) gave the Court
the authority to replace him with the first alternate.  Federal
Rule of Criminal Procedure 24(C)(1) permits a court to "impanel
up to 6 alternate jurors to replace jurors who are unable to
perform or who are disqualified from performing their duties."
If a court reconstitutes the jury, it "must instruct the jury to
begin its deliberations anew."  Fed. R. Crim. P. 24(C)(3).  In
considering whether to reconstitute a jury, the Court weighed the
potential for prejudice.

The limited available precedent suggests that the less time
a jury has been deliberating, the more likely it will be able to
restart its deliberations.  See United States v. Warner, 498 F.3d
666, 690 (7th Cir. 2007) ("[T]he further along deliberations
proceed, the more difficult it becomes to disregard them and
begin anew.").  The instant case bore no indicia of prejudice.
First, each of the jurors indicated that he or she could restart
deliberations.  Second, the alternate who replaced Juror No. 2

had been isolated from the deliberating jury.  See United States
v. Ottersburg, 76 F.3d 137, 139 (7th Cir. 1996).  In addition,
the jury had only been deliberating for a few hours before it had
to be reconstituted, and the reconstituted jury deliberated
longer than it had been out the first time.  See Warner, 498 F.3d
at 690 (upholding the reconstitution of a jury where "the
original jury deliberated for eight days and the reconstituted
jury deliberated for ten").  Thus, the Court is satisfied that
the jury restarted their deliberations in earnest and that Luisi
suffered no prejudice.

> **C.  JUROR NO. 3'S PRIOR DRUG USE AND ARREST DID NOT GIVE THE COURT GOOD CAUSE FOR DISMISSAL**

Because Juror No. 3's drug use and any legal consequences
resulting therefrom had lapsed by more than seven years, the
Court permitted him to remain on the jury.  The Court's decision
was based in part on the Jury Selection and Service Act, 28
U.S.C. § 1861, which provides:

> It is [] the policy of the United States that all
> citizens shall have the opportunity to be considered for
> service on grand and petit juries in the district courts
> of the United States, and shall have an obligation to
> serve as jurors when summoned for that purpose.

The Act excludes from service any potential juror who "has . . .
been convicted in a State or Federal court of record of, a crime
punishable by imprisonment for more than one year and his civil
rights have not been restored."  28 U.S.C. § 1865(b)(5).

It was not clear whether Juror No. 3 had ever been convicted

of any crime carrying a penalty of more than one year
imprisonment.  According to Juror No. 3, he did not "know whether
[his] arrest r[ose] to the level of felony."  Trial Tr. vol. 10,
39.  Even presuming he had been convicted of a felony, under §
1865(b)(5), he would be eligible to serve on a jury unless "his
civil rights had not been restored."  The statute, however, does
not specify which civil rights a potential juror must have
regained in order to be eligible for service; nor does it state
how a court may determine whether such rights have been restored.
Nevertheless, Judge Gertner's erudite opinion in United States v.
Green, 532 F. Supp. 2d 211, 212 (D. Mass. 2005) (Gertner, J.),
provided ample guidance.

In Green, the court concluded that, under § 1865(b)(5),
convicted felons – if not disqualified for some other reason –
are allowed to serve so long as "seven years has passed after the
date of the conviction."  Id. at 214.  Reasoning that "'[c]ivil
rights' plainly involves the right to vote [and] to serve on
juries," id. at 212, the court turned to Massachusetts laws
governing qualifications for voting and jury service.  The court
noted that under the Massachusetts Constitution, the convicted
felons who were not permitted to vote were those who were still
incarcerated or had been convicted of "corrupt practices in
respect to elections."  Id. (quoting Mass. Const. Amend. Art. 3).
The court also observed that in Massachusetts, disqualification

41

from jury duty "lasts only for seven years." Id. at 213.

In addition, the court reviewed the legislative history of
section 1865(b)(5) and determined that the statute requires "no
affirmative process by which civil rights are restored." Id. In
other words, a convicted felon need not present proof of a
special pardon or grant of amnesty in order to be eligible for
jury service. See id. Instead, the statute seemed amenable to
an approach consistent with Massachusetts law, which restores
convicted felons of their right to sit on a jury after seven
years. Id.

The decision in Green is consistent with the practice this
Court has employed both before and after that decision. Here,
Juror No. 3's drug use and any criminal consequences had occurred
approximately 35 years before Luisi's trial. Any civil rights
Juror No. 3 may have forfeited as a result of his youthful
indiscretion have returned. In light of his representation that
he could remain impartial, the Court determined that Juror No. 3
should remain.

## III. CONCLUSION

Based on the foregoing, the Court concluded that Juror No.
2's express representation that he would not follow the law as
instructed constituted good cause for removal. Federal Rule of
Criminal Procedure 23(b) suggested that substituting an alternate
juror was appropriate. In addition, the Court concluded that

42

Juror No. 3 should remain because any involvement with the criminal justice system had occurred more than seven years prior to the trial.


                              /s/ William G. Young
                              WILLIAM G. YOUNG
                              DISTRICT JUDGE